IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CITIZENS OF THE EBEY'S RESERVE FOR A HEALTHY, SAFE AND PEACEFUL ENVIRONMENT; and PAULA SPINA,<br><br>                              Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF THE NAVY, a military department of the United States; and TODD C. MELLON, in his official capacity as Acting Assistant Secretary of the Navy for Energy, Installations & Environment;<br><br>                              Defendants. | NO.<br><br>COMPLAINT |

## I.     NATURE OF ACTION

1.     The Department of the Navy is proposing to significantly increase its military aircraft operations at a Naval Air Station on Whidbey Island that has already grown well beyond all reasonable limits of compatibility with the surrounding area and community.

2.     The Department of the Navy prepared a draft and final Environmental Impact Statement to analyze the impacts of its proposed action.

COMPLAINT - 1

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

3.      On March 12, 2019, then-Assistant Secretary of the Navy for Energy, Installations and Environment, Phyllis L.  Bayer (since resigned and replaced by Acting Assistant Secretary Todd C. Mellon), issued a Record of Decision that adopts EIS Alternative 2A as the Navy's course of action.   Among other things, Alternative 2A adds 36 EA-18G "Growler" aircraft at NAS Whidbey Island; increases low-flying airfield operations at both Ault Field and Outlying Landing Field Coupeville ("OLF Coupeville"); and shifts a large percentage of the flights from Ault Field to OLF Coupeville.  The net result of these changes is a large increase in the number of extremely noisy, low-flying Growlers flying over portions of Whidbey Island near OLF Coupeville.  The Navy forecasts that in an average year, these changes will result in approximately 17,600  more takeoffs and landings and in a "high-tempo year" there will be 20,000 more takeoffs and landings.

4.      The Navy based its decision on a deeply flawed EIS that does not comply with the requirements of the National Environmental Policy Act ("NEPA").  The EIS fails to analyze  a reasonable range of alternatives as required by NEPA. The EIS fails to  adequately  analyze alternative sites; the Navy's purported consideration of off-Whidbey Island alternatives simply dismisses them from consideration. The actually analyzed action alternatives for Whidbey Island simply shuffle the number of flights at Ault Field and OLF Coupeville.  Those alternatives are so similar to one another that a real choice among truly different alternatives is missing. The EIS does not adequately analyze and disclose the environmental impacts and consequences of the Proposed Action or EIS Alternative 2A. The EIS fails to adequately analyze measures to mitigate the proposal's severe impacts on local residents, schools and communities, the nearby National Historic Reserve, and wildlife including marbled murrelets—a species listed as threatened under the federal Endangered Species Act and endangered under Washington state law— and southern resident orcas.

COMPLAINT - 2

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

5.     The Navy's deeply flawed analysis led to it adopting a proposal that subjects local residents to shocking and offensive levels of additional noise, causes irreparable harm to a National Historic Reserve, harasses and kills Washington's declining population of marbled murrelets, and harasses Washington's southern resident orcas.

6.     The U.S. Fish and Wildlife Service prepared a Biological Opinion and Incidental Take Statement regarding the Proposed Action.

7.     The U.S. Fish and Wildlife Service's Biological Opinion was based upon stale and inaccurate data regarding the number of total flights and the number of interfacility flights that would result from the Proposed Action.

8.     The U.S. Fish and Wildlife Service's Incidental Take Statement for marbled murrelets failed to meet the requirements of the Endangered Species Act, by, among other things, failing to clearly articulate the amount or extent of the anticipated incidental taking, failing to specify reasonable and prudent measures necessary or appropriate to minimize the anticipated take; failing to set forth terms and conditions to enforce any reasonable and prudent measures; and failing to provide a trigger to reinitiate consultation with the Navy.

9.     This action seeks judicial relief with respect to the Navy's EIS and Record of Decision, ordering the Department of the Navy to comply with the requirements of NEPA.  The decision approving the NAS Whidbey Island Complex Growler Proposal was arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

10.     Plaintiffs request that the Court set aside the Record of Decision pursuant to 5 U.S.C. § 706(2)(a) and enjoin its implementation.

11.     Plaintiff seeks a declaratory judgment, preliminary and final injunctive relief, an award of costs and expenses of suit, including attorney and expert witness fees pursuant to the

COMPLAINT - 3

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

Equal Access to Justice Act, 28 U.S.C. § 2412, and such other relief as this Court deems just and proper.

## II.      JURISDICTION

12.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States and involves the United States as a defendant.

13.     Defendants' issuance of the Record of Decision was the final administrative action of the United States Department of the Navy.  Thus, the Court has jurisdiction to review plaintiff's claims under the Administrative Procedure Act (APA).

## III.      VENUE

14.     Venue is proper in this Court under 28 U.S.C. § 1391.   All or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, defendants reside in this district, and the public lands and resources and agency records in question are located in this district.

## IV.      PARTIES

15.     Plaintiff Citizens of the Ebey's Reserve for a Healthy, Safe and Peaceful Environment ("Citizens of Ebey's Reserve" or "COER") is a non-profit public interest organization incorporated in 2012 and dedicated to protecting the health and welfare of the inhabitants of Whidbey Island and surrounding areas, including marine, migratory, and endangered species and preserving the historic northwest communities being threatened by military jet training flights.  Its registered office is located in Coupeville, Washington.   Plaintiff brings this action on its own behalf and on behalf of its adversely affected members.

COMPLAINT - 4

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

16.     Plaintiff Paula Spina is director of COER and a resident of, and business owner in, Central Whidbey whose residence and businesses are under the OLF flight path and who, therefore, is directly impacted by the Defendants' issuance of the Record of Decision.

17.     Defendant United States Department of the Navy ("Navy") is a military department within the United States Department of Defense subject to the authority, direction, and control of the Secretary of Defense.   The Department of the Navy manages the United States Navy, which is the naval warfare service branch of the United States Armed Forces.

18.     Former Assistant Secretary of the Navy for Energy, Installations & Environment Phyllis L.  Bayer signed the Record of Decision on March 12, 2019.  Phyllis Bayer resigned on March 30, 2019. Todd C. Mellon is named in his official capacity as Acting Assistant Secretary of the Navy for Energy, Installations & Environment.  In that capacity, he is charged with enhancing combat capabilities for the warfighter and greater energy security,  the acquisition and disposal of real property, construction and maintenance of installations, protecting the safety and occupational health of the military and civilian personnel, environmental protection, planning and restoration ashore and afloat, and conservation of natural and cultural resources.

## V.     STATEMENT OF STANDING

19.     The interests at stake in this matter are germane to the organizational purposes of Citizens of Ebey's Reserve.  The Navy's violations of law as set forth in plaintiffs' claims for relief threaten the health and welfare of the inhabitants of Whidbey Island. The action at issue also threatens surrounding areas (including marine, migratory, and threatened and endangered species that live, breed and forage in those areas), and Ebey's Landing, our Nation's first National Historic Reserve.

COMPLAINT - 5

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

20.     Paula Spina is a resident of and business owner in Central Whidbey whose residence and businesses are under the OLF flight path. The Navy's violations of law as set forth in the claims for relief herein threaten Ms. Spina's health and welfare and her use (including business use) and enjoyment of her property and the surrounding areas, including Ebey's Landing National Historic Reserve.

21.     The Proposed Action will cause invasion of actual concrete interests of the members of Citizens of Ebey's Reserve.  COER's individual members own property, live, study and attend school, sleep, watch birds, watch whales and other marine mammals, converse, kayak and enjoy diverse recreational activities on land that is adjacent to and near NAS Whidbey Island, and expect to continue to do so in the future.  The incompatibility of this escalating Navy presence will cause specific and concrete injuries to COER's organizational interests, as well as its members' auditory and non-auditory health and their use and enjoyment of their homes, their schools, their work, and their everyday lives.

22.     The Proposed Action involves the expansion of existing Growler operations at the NAS Whidbey Island complex with, among other things, the addition of 36 Growler aircraft assigned to the facility, which is four times more Growlers than the Navy proposed in 2005.

23.     Under Alternative 2A, total annual airfield operations at NAS Whidbey Island will increase by approximately 33% over the baseline.

24.     The increase in airfield operations at OLF Coupeville under Alternative 2A is even more striking—an increase of more than 270% over the baseline.

25.     The noise from these increased numbers of aircraft is extreme.  The noise is so loud that it interferes with the ability of people to have a conversation outdoors or indoors, to sleep in their own homes, and of children to learn in their classrooms.  The noise will ruin recreational

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

opportunities in and around the National Historic Reserve and will be so intense and frequent that it will cause adverse health effects on people in the exposed areas including members of Citizens of Ebey's Reserve.

26. Ebey's Landing National Historic Reserve was specifically established to "preserve and protect a rural community which provides an unbroken historical record from nineteenth century exploration and settlement in Puget Sound to the present time," 54 U.S.C.A. § 320101. The primary economic drivers in the rural community in and around Ebey's Landing National Historic Reserve are tourism and agriculture. Increased Growler operations make agriculture nearly impossible with the result that several small farms have already ceased farming operations. Increased Growler operations also threaten tourism.

27. Several parks and recreation areas in north and central Whidbey Island will be directly and adversely affected by aesthetic and noise impacts of the Proposed Action, including Ebey's Landing National Historic Reserve. Citizens of Ebey's Reserve's members use and enjoy the unique natural setting in these areas for recreational, scientific, spiritual, educational, aesthetic, and other purposes. COER's members enjoy hiking, biking, observing wildlife, relaxing, conversing, and other activities in these areas and will continue to do so in the future. The annoyance and other impacts of aircraft noise will directly and adversely affect COER's members' use and enjoyment of these parks and recreation areas.

28. Several environmentally sensitive areas that provide important wildlife habitat will be directly and adversely affected by noise impacts of the Proposed Action. Citizens of Ebey's Reserve's members enjoy the unique natural setting in these areas for the purpose of observing the fish and wildlife and will continue to do so in the future. Adverse impacts of aircraft noise on

COMPLAINT - 7

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

birds, fish, marine mammals and other wildlife will directly and adversely affect COER members' enjoyment of these areas.

29. The interests of Citizens of Ebey's Reserve and its members have been and will continue to be injured and harmed by defendants' failure to comply with NEPA. COER's interests are protected by NEPA, and defendants' failure to comply with NEPA directly harms those interests. Unless the relief prayed for herein is granted, Citizens of Ebey's Reserve and its members will suffer ongoing and irreparable harm and injury to their interests.

30. The injuries to Citizens of Ebey's Reserve will be redressed by a favorable decision of this Court because an order granting the relief requested in this Complaint will ensure that the Proposed Action will not result in significant new adverse environmental impacts without the due consideration required by NEPA.

## VI.    ADDITIONAL FACTUAL ALLEGATIONS

A.    Naval Air Station Whidbey Island

31. Naval Air Station (NAS) Whidbey Island is a naval air station of the United States Navy located on Whidbey Island in Island County, Washington.

32. The NAS Whidbey Island complex includes the main air station (Ault Field), OLF Coupeville, the Seaplane Base, and Lake Hancock. The main portion of the base, Ault Field, is in the north central part of Whidbey Island near the City of Oak Harbor. OLF Coupeville is located in a peaceful setting immediately adjacent to Ebey's Landing National Historic Reserve about 10 miles south of Ault Field and is used primarily for landing practice.

33. NAS Whidbey Island began its operations in 1942 and was designated as a Master Jet Station in 1951, which expanded its mission to include jet aircraft training and operations of

COMPLAINT - 8

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

carrier-based squadrons.  The EA-18G Growler began operations at NAS Whidbey Island for the first time in 2007.

34.     EA-18G Growlers conduct field carrier landing practice (FCLP) at OLF Coupeville. The typical practice pattern involves a takeoff, a quick low-level loop around the area, and then landing.  This loop pattern is repeated again and again with many takeoffs and landings occurring one after another during the practice session.

B.     Surrounding Land Uses

35.     Northern and central Whidbey Island are not suitable locations for military aircraft operations at the level proposed by the Navy.

36.     The NAS Whidbey Island complex is surrounded by residences, schools, businesses, environmentally sensitive areas, at-sea foraging areas for the marbled murrelet (a federally-protected species), areas frequently used by southern resident orcas, parks and recreation areas, and a National Historic Reserve.

37.     The incompatibility of escalating Navy presence in north and central Whidbey Island has been a subject of much controversy since at least April 29, 1992, when the owners of forty-six parcels of land surrounding the Naval Air Station Whidbey filed an inverse condemnation action against the United States, alleging that the Government took their private property for public use without paying just compensation in violation of the Fifth Amendment. *See Argent v.  United States*, 124 F.3d 1277 (Fed.  Cir.  1997) (vacating and remanding Court of Federal Claims grant of summary judgment against landowners and describing factual setting).

38.     In 2005, the Navy issued a Finding of No Significant Impact for the addition of EA-18G "Growler" operational aircraft to the Naval Air Station ("NAS") Whidbey Island and determined that "an Environmental Impact Statement (EIS) is not required[.]" Following litigation

COMPLAINT - 9

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

over that determination (*Citizens of the Ebey's Reserve for a Healthy, Safe and Peaceful Environment v. U.S. Dept. of the Navy, et al.*, Case No. 2:13-cv-01232), the Navy agreed to prepare an environmental impact statement.

C.    Proposed Action

39.    The Navy proposes to continue and expand existing Growler activities at the NAS Whidbey Island complex, which includes repetitive landing practices by 2–5 Growler aircraft per 45-minute session, at Ault Field and OLF Coupeville.

40.    The Proposed Action includes adding 35 to 36 EA-18G Growler aircraft to NAS Whidbey Island and shifting a large percentage of the landing practices from Ault Field to OLF Coupeville.

D.    Purpose and Need, Alternatives Beyond Whidbey, and Cost

41.    The Navy prepared an EIS to assess environmental issues related to its proposed action. In the EIS, the described purpose of the Proposed Action is "to augment the Navy's existing Electronic Attack community at NAS Whidbey Island by operating additional Growler aircraft that have been appropriated by Congress." EIS at 1-5. The EIS states that the need for the Proposed Action is "to maintain and expand Growler operational readiness to support national defense requirements under" federal law. *Id.*

42.    By limiting the purpose to increasing Growler operations on Whidbey and nowhere else, the EIS precludes consideration of other, potentially preferable, off-Whidbey sites for the Growlers.

43.    The Navy's consideration of alternatives was artificially constrained by this narrow purpose and need statement and precluded consideration of feasible, environmentally preferable alternatives.

COMPLAINT - 10

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

44.     The EIS stated that moving Growler squadrons to another location would involve excessive cost and major new construction without providing any supporting analysis for that conclusion.

45.     Because cost was stated to be relevant to the choice of alternatives that were considered, the EIS should have incorporated or appended a cost-benefit analysis to support, justify, and explain the reasons for not providing a detailed analysis of any off-Whidbey sites.

46.     The current and proposed expanded use of NAS Whidbey Island involves excessive costs, both economic and socioeconomic to Island County, the residents of Whidbey Island, and others.  These costs were not adequately analyzed and disclosed in the EIS.

E.     Alternatives at Whidbey

47.     The EIS evaluated a no-action alternative and three action alternatives for increasing Growlers at Whidbey.

48.     The three action alternatives that were evaluated in the EIS are so similar as to provide almost no meaningful distinction between them regarding the number of Growlers to be brought to Whidbey.  Alternative 1 proposes adding 35 new Growlers, Alternative 2 proposes adding 36 new Growlers, and Alternative 3 proposes adding 36 new Growlers.

49.     The EIS devoted a considerable portion of its analysis to presenting a redundant analysis of these three practically identical alternatives.  The result was, not surprisingly, a conclusion that all three alternatives in many respects would have nearly identical environmental impacts.

50.     The EIS should have, but did not, rigorously explore and objectively evaluate all reasonable alternatives that were eliminated from detailed study.  The EIS did not inform decision-

COMPLAINT - 11

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

makers and the public of reasonable alternatives to the proposal that would avoid or minimize the adverse significant impacts of the proposal.

51.     For example, the EIS should have considered a markedly smaller number of aircraft than what was being proposed, and alternative off-Whidbey basing or practice venues, so that the decision makers and the public could see and compare those impacts with the impacts of adding 35 or 36 aircraft at NAS Whidbey Island.

F.          Noise Impacts

52.     The EIS does not adequately analyze and disclose the environmental impacts and consequences of the Proposed Action with respect to noise associated with aircraft operations at NAS Whidbey Island.

53.     The aircraft noise at NAS Whidbey Island from the Proposed Action will cause significant annoyance, speech interference, sleep interference, classroom/learning interference, effects on recreation, and health effects—including permanent hearing loss—on residents and visitors in the exposed communities.

54.     Noise from Growlers is not just like 'being near an airport;' the Growler engines are far louder than commercial aircraft.  The planes are flown in repetitious patterns at extremely low elevation (sometimes 200–500 feet above the ground and lower during takeoff and landing) across neighborhoods and natural and historic areas.  The noise is enhanced by significant turbulence and low frequency vibrations.

55.     Aircraft noise levels are represented in the EIS by various noise metrics that are generated by a computer model and not based upon actual, on-site measurements at Ault Field or OLF Coupeville. The model provided estimates of noise levels from current operations and future

COMPLAINT - 12

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

alternatives.  The model is not reliable.  The model results for current operations do not match measurements of current operations.

56.     Citizens of the Ebey's Reserve retained JGL Acoustics of Issaquah, WA, to conduct actual noise recordings of Growlers when using OLF Coupeville for repetitive landing practice in May 2013, February 2016, and June 2019.

57.     The National Park Service conducted on-site noise recordings of repetitive landing practices at OLF Coupeville in the summer of 2015 and reported its findings and conclusions in an Acoustical Monitoring Report dated November, 2016.  The National Park Service findings were consistent with the JGL Acoustics findings.

58.     Navy's modeled noise reported in the EIS grossly underestimate noise compared with the actual noise levels recorded by JGL Acoustics and the National Park Service. The EIS fails to provide adequate justification for using noise data generated by a computer model and not based upon actual, on-site measurements at Ault Field or OLF Coupeville.

59.     The existing environment noise and the noise impacts of the Proposed Action were modeled using FA-18E/F "Super Hornet" data in the computer model.  The Super Hornet is a different aircraft from the Growler.

60.     The EIS fails to provide adequate justification for using noise data for the Super Hornet instead of data for the actual aircraft that will be causing the noise impacts.

61.     The EIS provides misleading information by emphasizing metrics based on averaging sound levels over long periods of time.  The averages water down the description of the true noise impacts.  People and animals do not hear noise as an average of noisy events and intervening quieter periods.  The noisy events are the pertinent data and predictions, yet those receive little attention in the EIS.

COMPLAINT - 13

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

62.     The EIS's misleading focus on average noise levels is compounded by the EIS's use of an outdated and misleading benchmark for assessing whether the average noise levels are significant.  The average noise level forecasts are expressed in the "day-night" noise level (DNL).

63.     According to the EIS, 87% of the population is not highly annoyed by outdoor sound levels below 65 dB DNL.  Based on this and other information in the EIS, the 65 dB DNL is set in the EIS as the threshold for significant noise impacts.

64.     The EIS threshold of 65 dB DNL for high noise annoyance has been scientifically discredited as an inappropriate and flawed method for evaluating the noise impacts. The EIS, however, uses that 65 dB DNL metric, which understates impacts of the Proposed Action.  Current studies and analysis reflect that a reasonable high annoyance threshold level is no more than 55 dB DNL.

65.     Thus, the heart of the EIS noise analysis suffers twin defects. It relies on computer modeled long-term averages instead of actual short-term or instantaneous impacts and it then compares the misleading averages to an unduly high threshold for determining significant impacts. Because the EIS analysis of noise impacts is erroneously based on the 65 dB DNL noise contour, the EIS underestimates the size of the residential population and the size of areas (including, but not limited to, the areas within Ebey's Landing National Historic Reserve) that will be significantly impacted by the Proposed Action.

66.     The EIS failed to analyze that the Growler's standard F414-400 engine can be retrofitted and enhanced to produce significantly more thrust and, hence, more noise. Neither the likelihood of such enhancements nor the consequences of additional noise from retrofitted engines were analyzed.

COMPLAINT - 14

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

67.    The EIS contains limited information about instantaneous noise impacts (referenced as "$L_{max}$" in the EIS).  The EIS includes predictions of the number of times $L_{max}$ exceeds 50 decibels at various locations.  Noise impacts will be much more severe when $L_{max}$ is 60 or 70 or higher.  The EIS fails to include adequate information about the number of events when $L_{max}$ will be at any level other than 50 decibels.  To the extent information is provided, it is based on modeled sound impacts, not actual measurements.  This missing information is important to allow the Navy and the public to assess the consequences of the proposal and its alternatives and to assess the need for mitigation. At various points of interest (POIs) the EIS provided modeled estimates of the number of times in a year when Growler noise would exceed $L_{max}$ values of 80, 90, and 100 dB. The JGL Acoustics and National Park Service's on-site Growler noise data were collected at four sites very close to four POIs (Table 4.2-4). The modeled noise-event incidences at those four POIs was grossly underestimated, based on the on-site recordings data at each of those comparable sites revealing a much higher incident rate. This exposes shortcomings in the POI modeled data, not only in Table 4.2-4 of the EIS, but in  all the POI-related tables, all of which are based on the same erroneous modeling.

68.    The Navy's failure to fully analyze and disclose noise impacts is contrary to NEPA's underlying purpose and requirement of disclosure of environmental impacts.

G.        Historic District Impacts

69.    Implementation of the Proposed Action will result in significant adverse impacts to Ebey's Landing National Historic Reserve, our Nation's first National Historic Reserve.

70.    Congress created Ebey's Landing National Historic Reserve in 1978 to preserve and protect a rural community which provides an unbroken historical record from nineteenth century exploration and settlement in Puget Sound to the present time.  The approximately 17,000 acre

COMPLAINT - 15

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

reserve preserves the natural setting and cultural history of the Ebey's Landing National Historic Reserve area on Whidbey Island south of Penn Cove and southwest of the Town of Coupeville.

71.     OLF Coupeville is located partially within and partially abutting Ebey's Landing National Historic Reserve.

72.     The acoustic environment of Ebey's Landing National Historic Reserve is an especially valuable resource and degradation of that environment by excessive noise is particularly significant and harmful in this unique area.

73.     People visit Ebey's Landing National Historic Reserve to see, hear, and experience a unique natural and historic cultural environment; to savor the quiet; or to hear the wind and waves, bird vocalizations, or a coyote's wail, against the backdrop of history. The significant noise impacts that will result from this project will impede and undermine the use of the area for resource protection, public use and enjoyment, agriculture, and tourism.

74.     The EIS does not adequately analyze and disclose the environmental impacts and consequences of the Proposed Action with respect to impacts to Ebey's Landing National Historic Reserve.

75.     The assumptions and conclusions about noise impacts to Ebey's Landing National Historic Reserve are misleading, incorrect, and understated because they are based on misleading, incorrect and understated assessments of the noise generated by the Growlers.  See above ¶¶ 52–68.

76.     Low frequency rumbles of Growlers carry further than other noise and traverse the full extent of Ebey's Landing National Historic Reserve, shaking windows and rattling walls, throughout the entire time that Growlers practice at OLF Coupeville.  The EIS failed to adequately assess the impacts of this low frequency noise on the Reserve and, as a result, provides misleading

COMPLAINT - 16

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

and incorrect conclusions that understate the actual noise impacts to the Ebey's Landing National

Historic Reserve users' experience.

77.     The National Historic Preservation Act (NHPA) requires the Navy to "make a reasonable and good faith effort to identify historic properties; determine whether identified properties are eligible for listing on the National Register ...; [and] assess the effects of the undertaking on any eligible historic properties found." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 607 (9th Cir. 2010). The Navy must also engage in consultation with the State Historic Preservation Officer (SHPO) to "[d]etermine and document the area of potential effects," "[g]ather information," and "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." 36 C.F.R. §§ 800.4(a), 800.6(a).

78.     The required consultation process is set out in Section 106 of the National Historic Preservation Act, which requires federal agencies to consider the effects of federal undertakings on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register prior to approving the undertaking. 54 U.S.C. § 306108; 36 C.F.R. § 800.1. "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). If an agency finds that an adverse effect will occur, then the agency shall engage in further consultation to resolve adverse effects to historic properties through avoidance, minimization, or mitigation. *Id.* §§ 800.5(2), 800.6(b); 800.8(c)(v).

COMPLAINT - 17

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

79.     During the Section 106 consultation process, the Washington State Historic Preservation Officer (SHPO) repeatedly stated that the Navy's proposed mitigation measures were inadequate to address the adverse effects on the impacted historic resources.

80.     Before making its determination under Section 106, the Navy terminated consultation with the SHPO, the Ebey's Landing Historic Reserve Trust Board, and other consulting parties because the Navy disagreed with the SHPO on the type and amount of mitigation appropriate to resolve adverse effects to Ebey's Landing National Historical Reserve.

81.     The Navy selected the alternative deemed to have the most severe adverse impact on historic and cultural resources within Ebey's Landing National Historical Reserve.

82.     After terminating consultation with the SHPO, the Navy requested that the Advisory Council on Historic Preservation participate and provide comments, as required by 36 C.F.R. § 800.7(c).

83.     The Advisory Council on Historic Preservation recommended that the Navy mitigate adverse effects by working with stakeholders to monitor actual noise impacts associated with expanded Growler operations, work with stakeholders to develop mitigation measures based on the results of the monitoring of actual noise levels, and work with stakeholders to identify ways to reduce noise.

84.     The Navy declined to adopt the Advisory Council on Historic Preservation's recommendations and failed to provide an adequate rationale for rejecting the Council's recommendations.

85.     The Navy's actions were arbitrary and capricious when it refused to adopt the recommendations from the Advisory Council on Historic Preservation.  The Navy's reliance on its own mitigation measures is arbitrary and capricious because they do not meaningfully address

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

the adverse impacts of the Navy's expanded EA-18 Growler operations on Ebey's Landing

Historic Reserve and do not truly or adequately mitigate or resolve adverse impacts to the area.

H.      Wildlife Impacts

86.     Implementation of the Proposed Action will result in significant adverse impacts to wildlife listed under the Endangered Species Act as a result of increased noise exposure.

87.     The EIS does not adequately analyze and disclose the environmental impacts and consequences of the Proposed Action with respect to wildlife impacts caused by noisy Growler operations at NAS Whidbey Island.

88.     Noise created by humans may disrupt ecosystem processes by interfering with predator-prey relationships and the ability of wildlife to communicate, establish territory, reproduce, and support and protect offspring.

89.     The marbled murrelet is a small seabird that inhabits nearshore marine environment in western North America.  The species was listed as threatened under the U.S.  Endangered Species Act in 1992 in Washington, Oregon and California and was subsequently listed by the Washington Fish and Wildlife Commission as threatened in 1993.

90.     In 2017, the marbled murrelet was reclassified by the Washington Fish and Wildlife Commission as endangered.

91.     The marbled murrelet has the unusual behavior among seabirds of flying considerable distances inland during the breeding season to establish nest locations.  From April to mid-September, breeding murrelets make daily flights from marine foraging areas to tend inland nest sites.  These flights are often quite long—one radio-tagged murrelet nesting in the Hoh River drainage of the Olympic Mountains regularly foraged in the San Juan Islands, making daily flights

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

of about 70 miles from its nest.  Another murrelet nesting in the Cascade Range foraged in the San Juan Islands more than 75 miles from its nest.

92.    The distribution of murrelets in Washington includes the southern Salish Sea and the outer coast.

93.    In Washington, murrelets receive extra protection during their nesting and rearing season.  Murrelet egg laying and incubation occurs from April to early August and chick rearing occurs between late May and September.  State regulations provide an extra level of protection from April 1 to September 23.

94.    The marbled murrelet has a naturally low reproductive rate; when in breeding condition, females produce a relatively large single egg (nearly 25% of body mass) and one brood per season.  Given the high energy cost of breeding, females are not likely to be in breeding condition every year and may nest in alternate years.

95.    The 2015 marbled murrelet population estimate for all of Washington was about 7,500 birds.

96.    In Marbled Murrelet Conservation Zone 1, which encompasses all of the Salish Sea and the Action Area for the Navy's Proposed Action, there are approximately 4,614 murrelets.

97.    Despite the protection intended to be provided by the federal and state listings, the population of marbled murrelets in Conservation Zone 1 continues to decline.  The population is dwindling at a rate of approximately 4.9% per year.  The population has dropped 44% reduction since 2001.

98.    In Washington, murrelets and their chicks are literally starving to death.  Eighty per cent of murrelet eggs do not result in fledglings because the chicks starve or because lack of food for the adults makes them abandon their eggs before completing incubation.

COMPLAINT - 20

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

99.     An adult marbled murrelet feeding a nestling will hold a single prey item (*e.g.*, sand lance, herring or anchovy) in its beak while sitting on the water before flying inland to deliver the prey.

100.    Fish-holding marbled murrelets tend to swallow the prey when they are disturbed—for instance, by an overflight of an extremely loud plane—instead of bringing the prey to the nest for the nestling.  If the adult marbled murrelet is successful in catching a new prey item for the nestling, the nestling will experience a delayed feeding.  If the adult marbled murrelet is unsuccessful replacing the lost prey, the nestling will miss its feeding.

101.    Marbled murrelets feed their nestlings one to eight times per day.  Assuming an average of four times per day, a single missed feeding would constitute a loss of 25% of that day's food and water intake for the nestling.

102.    Food limitation often results in poor growth, delayed fledging, increased mortality of murrelet chicks, and nest abandonment by adults.

103.    Growlers will be operating at power settings and altitudes that will expose sub-adult and adult marbled murrelets to extremely high noise levels and vibration sound waves.

104.    In addition to swallowing prey items, murrelets will often either dive, or fly and leave the foraging area, in response to the noise from Growler overflights.  Both diving and flying force the birds to consume energy that they need for other survival purposes.

105.    By diving or flying in response to aircraft overflights sub-adult and adult marbled murrelets will expend energy that they can only replace by capturing additional prey.  Given the number of overflights proposed, and the long duration of the activity (thirty years), some sub-adult and adult marbled murrelets will not be able to replace energy spent responding to disturbances.

COMPLAINT - 21

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

Ultimately, the inability of sub-adult and adult marbled murrelets to replace energy lost responding to overflights creates a likelihood of injury or death from starvation.

106.   The EIS failed to adequately consider, analyze and disclose the impacts of the proposal on marbled murrelets.

107.   The EIS failed to adequately disclose or analyze that marbled murrelet nestlings, sub-adults, and adults will die from starvation due to the noise from Growler overflights year-round, during both the day and the night, over the thirty year term of the proposed action.

108.   The EIS failed to adequately disclose or analyze that marbled murrelet nestlings, sub-adults, and adults will be annoyed it to such an extent as to significantly disrupt normal behavioral because of the noise from Growler overflights year-round, during both the day and the night, over the thirty year term of the proposed action.

109.   The EIS fails to disclose, consider or analyze the cumulative impacts of the Proposed Action with other Navy Actions adversely affecting marbled murrelets in the area near NAS Whidbey.

110.   For example, the EIS fails to disclose, consider or analyze the cumulative impacts of the noise impacts from the Proposed Action with the noise impacts from the over-water activities discussed in the Northwest Training and Testing Final EIS/OEIS, which involves areas in close proximity to and overlapping with FCLP activities at OLF Coupeville.

111.   Each roundtrip interfacility flight between Ault Field and OLF Coupeville will subject at-sea marbled murrelets in an area of 75.5 square miles, on average, to extremely high sound levels.   Under Alternative 2A, in an average year, there will be approximately 1,483 roundtrip interfacility flights between Ault Field and OLF Coupeville.   In estimating the size of

COMPLAINT - 22

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

areas that will be subjected to various noise levels from Growler operations, the EIS omitted all over-water marbled murrelet habitat.

112.   The U.S. Fish and Wildlife Service's June 14, 2018 Biological Opinion was based upon data provided by the Navy estimating that under Alternative 2A, in an average year, there will be approximately 2,899,530 total airfield operations at NAS Whidbey Island over thirty years.

113.   The Fish and Wildlife Service set 2,899,530 flights over thirty years as the maximum number allowed without triggering a need for additional consultation.

114.   Under Alternative 2A (adopted by the Navy in the Record of Decision), the Navy estimates that there will be approximately 3,363,000 total airfield operations at NAS Whidbey Island over thirty years.

115.    The Navy's adoption of an alternative in excess of the number of flights authorized by the Incidental Take Statement triggers the requirements in the ESA and the Incidental Take Statement to re-initiate consultation.

116.   The Navy defendants did not reinitiate consultation with U.S. Fish and Wildlife Services as required by 50 C.F.R. § 402.16 and the Incidental Take Statement, even though new information revealed effects of the action that will affect marbled murrelets to a greater extent than previously considered.

117.   The U.S. Fish and Wildlife Service's Incidental Take Statement (ITS), which authorizes the Navy to proceed with its proposal, fails to meet the requirements of the Endangered Species Act in at least the following ways:

     a.   The ITS fails to clearly articulate the amount or extent of the anticipated incidental taking or the impact of this level of take on marbled murrelets at the local level and

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

where it does articulate the amount or extent of the anticipated incidental take, it is misstated and based upon stale and inaccurate data.

b. The ITS fails to specify reasonable and prudent measures necessary or appropriate to minimize the anticipated take of marbled murrelets.

c. The ITS fails to set forth terms and conditions to enforce any reasonable and prudent measures.

d. The ITS fails to provide a trigger to reinitiate consultation with the Navy regarding impacts to marbled murrelets.

118.    The EIS does not adequately analyze and disclose the environmental impacts and consequences of the Proposed Action with respect to impacts on southern resident orcas (also called southern resident killer whales).  The EIS asserts that impacts to southern resident orcas are insignificant, without providing a rationale grounded in high quality scientific information and without insuring the professional integrity, including scientific integrity, of the discussions and analyses regarding southern resident orcas. 40 C.F.R. §§ 1500.1; 1502.24. For example, the Navy asserts that the impacts on southern resident orcas "would be spread out over the course of a year," and references the number of days of FCLP flights in 2015. The Navy fails to analyze the impacts of more than 100,000 flights over the course of a year under Alternative 2A and improperly minimizes the impacts of those flights by only discussing days of flight operations, rather than number of flights.

119.    The Navy  failed to consider cumulative noise impacts on threatened and endangered species, and other wildlife, from the Proposed Action in combination with the noise impacts discussed in the 2015 Northwest Training and Testing EIS. The noise impacts from the proposed actions at NAS Whidbey Island and the 2015 Northwest Training and Testing will

COMPLAINT - 24

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

overlap and concurrently affect marine areas used by marbled murrelets and southern resident orcas. By ignoring the cumulative effects of the two proposed actions, the Navy unlawfully segmented its review and analysis, resulting in inadequate analyses and disclosure of the environmental impacts of the NAS Whidbey Island Proposed Action.

I.      Toxic Chemical Impacts

120.    The EIS does not adequately analyze and disclose the environmental impacts and consequences of the Proposed Action with respect to per- and polyfluoroalkyl substances ("PFAS") associated with operations at NAS Whidbey Island.

121.    PFAS in the form of aqueous film-forming foam ("AFFF") used for firefighting and fire suppression training are being discharged by NAS Whidbey Island into surface waters on and near the base.

122.    The Proposed Action will increase stormwater flow, which, upon information and belief, will increase the Navy's discharges of PFAS into surface waters on and near the base. Defendants did not adequately consider or analyze the environmental impacts of increased PFAS discharges flowing from the Proposed Action.

123.    PFAS are persistent in the environment; bio-accumulative; highly mobile in water; and are toxic in very small concentrations.

124.    While the Navy  failed to consider or analyze the impacts of PFAS on wildlife,  the Navy knows that PFAS are toxic to humans in very small concentrations—in the parts per trillion. PFAS are suspected carcinogens and have been linked to growth, learning and behavioral problems in infants and children; fertility and pregnancy problems, including pre-eclampsia; interference with natural human hormones; increased cholesterol; immune system problems; and interference with liver, thyroid, and pancreatic function.  PFAS have been linked to increases in

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

testicular and kidney cancer in human adults.  The developing fetus and newborn babies are particularly sensitive to PFAS.

125.    Because PFAS accumulate in animals in the food chain, top-level predators concentrate PFAS in their blood and muscle tissues, causing harmful effects including reproductive harm.

126.    The EIS fails to discuss, address or analyze the effects of PFAS on wildlife, including on trophic level predators like marbled murrelets and southern resident orcas, other marine mammals, and other wildlife in the aquatic food chain.

J.    Climate Change and Air Quality Impacts

127.    The EIS fails to adequately disclose, consider or analyze the impacts of the Proposed Action on the State of Washington's efforts to meet its greenhouse gas emission reduction targets.

128.    The Navy erred in calculating the baseline fuel use and resulting greenhouse gas emissions for the baseline No Action Alternative.

129.    The Navy's error in calculations for the baseline fuel use and resulting greenhouse gas emissions for the baseline No Action Alternative is carried over into the projected greenhouse gas emissions under Alternative 2A.

130.    The final EIS states at Vol. 2, Appendix B, at page B-7 that the baseline average annual fuel use is 9,443,989.06 gallons of jet fuel.

131.    In the Navy's fiscal year 2016, all EA18G Growlers for NAS Whidbey Island were actually issued 20,253,643 gallons of jet fuel, more than twice the baseline average annual fuel use calculated at Vol. 2, Appendix B, at page B-7.

COMPLAINT - 26

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

132.     Rather than basing its calculations on actual fuel use by EA-18G Growlers, the Navy based its calculations on assumptions regarding fuel use and resulting emissions, assumptions which were in error and grossly misrepresent the emissions under both the baseline and Alternative 2A.

133.     Because the assumed emission factors chosen by the Navy in preparing the EIS were too low, both the increase compared to baseline and the absolute amount of gallons of jet fuel (and thus $CO_2$ emissions) are underestimated under Alternative 2A.

134.     The table titled "Alternative 2A Average Year EA-18G (Growler) Air Emissions, NAS Whidbey Island Complex" at Vol. 2, Appendix B, at page B-22,  erroneously states that total fuel use under Alternative 2A in an average year will be 13,331,805 gallons of jet fuel, and the resulting total $CO_2$ emissions will be 139,065.1 tons per year.

135.     If the Navy had calibrated its assumptions regarding fuel use and resulting emissions to actual fuel use, the average year total fuel use under Alternative 2A should have been 28,591,553 gallons of jet fuel and the resulting total $CO_2$ emissions should have been 298,240 tons per year, each more than twice what the Navy assumed.

136.     The Navy's miscalculations regarding greenhouse gas emissions in Vol. 2, Appendix B is carried over to the final EIS at Vol. 1, Table 4.16-2.

K.   Electromagnetic Radiation Impacts

137.     The Navy failed to adequately analyze or disclose the environmental impacts of fixed and mobile sources of electromagnetic radiation from the Proposed Action.

L.   Consequences of Mishap

138.     The EIS fails to properly delineate accident potential zone risks to Coupeville schools and a large daycare facility by using a singular uniform takeoff pattern for civilian and

COMPLAINT - 27

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

commercial aviation that does not conform to the multiple takeoff and landing patterns (tracks) used by the Navy when conducting Growler field carrier landing practice at OLF Coupeville.

M. Inadequate Mitigation

139.    The EIS and Record of Decision fail to sufficiently identify and assess mitigation that is specified and actually capable of being carried out, as required by NEPA.

140.    The EIS and Record of Decision fail to sufficiently identify and assess mitigation of noise impacts, and failed to identify and assess a monitoring program to assess the actual, as opposed to computer modeled, direct, indirect, and cumulative noise impacts of the Proposed Action.

141.    The EIS and Record of Decision fail to sufficiently identify and assess mitigation for noise impacts, including low frequency noise impacts, at Ebey's Landing National Historic Reserve.

142.    The EIS and Record of Decision fail to sufficiently identify and assess mitigation for impacts to marbled murrelets, and failed and failed to identify and assess a marbled murrelet monitoring program.

143.    The EIS and Record of Decision fail to sufficiently identify and assess mitigation for greenhouse gas and criteria pollutant emissions.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF NEPA
### Failure to Adequately Disclose and Analyze Environmental Impacts

144.    Plaintiffs restate and incorporate by reference all preceding paragraphs.

145.    NEPA is a procedural statute that requires federal agencies to take a hard look at the environmental consequences of the proposed action using high quality scientific information and

COMPLAINT - 28

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

insuring the professional integrity, including scientific integrity, of the discussions and analyses. An agency complies with NEPA's hard look requirement if the procedure followed by the agency resulted in a reasoned analysis of the evidence before it.  NEPA mandates that the disclosure of high quality information detailing the environmental impacts of the Proposed Action be made available to public officials and citizens before actions are taken.  40 C.F.R. § 1500.1(b).

146.    Agencies must ensure scientific accuracy and disclose all methodology used to evaluate environmental impact statements.  40 C.F.R. § 1502.24.  If information is incomplete or lacking, agencies are required to disclose this limitation.  40 C.F.R. § 1502.22.

147.    When faced with incomplete or unavailable information, defendants ignored, denied, or glossed over their lack of information, contrary to the requirements of 40 C.F.R. § 1502.22. Instead, defendants papered-over their incomplete or unavailable information with erroneous computer modeling and outdated, invalidated and misleading noise modeling. Defendants also denied or conveniently overlooked the most current scientific findings of the world's health experts on the detrimental impacts of noise on auditory and non-auditory health, fetal health, and childhood learning.

148.    The EIS fails to adequately disclose and analyze the environmental impacts of the Proposed Action as required by NEPA.  40 C.F.R. § 1500.1(b).

149.    The EIS fails to disclose and analyze the direct, indirect, and cumulative noise impacts of the proposal.

150.    The EIS fails to disclose and analyze the direct, indirect, and cumulative impacts of the Proposed Action on historic and cultural resources.

151.    The EIS fails to disclose and analyze the direct, indirect, and cumulative wildlife impacts of the proposal.

COMPLAINT - 29

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

152.     The EIS fails to disclose and analyze the direct, indirect, and cumulative toxic chemical impacts of the proposal.

153.     The EIS fails to disclose and analyze the direct, indirect, and cumulative climate change and air quality impacts of the proposal.

154.     The EIS fails to disclose and analyze the direct, indirect, and cumulative electromagnetic radiation impacts of the proposal.

155.     The EIS fails to disclose and analyze the direct, indirect, and cumulative impacts of aircraft mishaps under the proposal.

156.     The EIS fails to disclose and analyze the direct, indirect, and cumulative impacts of mitigation measures that may be utilized under the Proposed Action.

157.     The EIS also fails to take the necessary hard look at all of these impacts as required by NEPA.

158.     Defendants' actions are arbitrary, capricious, not in accordance with law, and taken without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF NEPA
### Failure to Analyze an Adequate Range of Alternatives

159.     Plaintiffs restate and incorporate by reference all preceding paragraphs.

160.     In preparing an EIS, NEPA requires the agency to "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 102(2)(E).

161.     The EIS must rigorously explore and objectively evaluate all reasonable alternatives and should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the

COMPLAINT - 30

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

decision-maker and the public.  This consideration must include reasonable alternatives not within the jurisdiction of the lead agency.  This analysis also must include appropriate mitigation measures not already included in the proposed action or alternatives.  40 C.F.R. §1502.14. The range of alternatives considered in the EIS flows from the agency's statement of purpose and need. If the purpose and need are defined too narrowly, the agency's consideration of alternatives is artificially constrained, defeating NEPA's fundamental aim to identify workable alternatives in time to avoid environmental harm. In preparing an EIS, the agency must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."  40 C.F.R. § 1502.13.

162.    This EIS defines the purpose and need of the Proposed Action as "to augment the Navy's existing Electronic Attack community at NAS Whidbey Island by operating additional Growler aircraft that have been appropriated by Congress."

163.    The purpose and need statement effectively excluded consideration of off-Whidbey locations for operating additional Growler aircraft.

164.    Off-Whidbey locations are reasonable alternatives to locating the Growlers at Whidbey.

165.    The Navy violated NEPA by defining the purpose and need narrowly to exclude reasonable off-Whidbey alternatives.

166.    Defendants also did not meaningfully consider the alternative of adding fewer than 35 Growler aircraft at Whidbey.

167.    Defendants fail to adequately explain why reasonable alternatives were either not considered or removed from consideration within the EIS.

COMPLAINT - 31

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

168.     Defendants' actions violate NEPA and its implementing regulations.  *See* 40 C.F.R. § 1502.13; 1502.14.

169.     Defendants' actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF NEPA**
**Failure to adequately analyze mitigation measures**

170.     Plaintiffs restate and incorporate by reference all preceding paragraphs.

171.     In preparing an EIS, NEPA requires the agency to fully analyze the environmental impacts of each identified alternative, including "appropriate mitigation measures."  40 C.F.R. § 1502.14(f).

172.     NEPA requires the agency to fully discuss the environmental consequences of the alternatives identified, including a discussion of the "means to mitigate adverse environmental impacts."  40 C.F.R. § 1502.16(h).

173.     The EIS fails to provide an adequate discussion of appropriate mitigation measures for noise impacts within the Proposed Action area.

174.     The EIS fails to provide an adequate discussion of appropriate mitigation measures for historic resources within the Proposed Action area.

175.     The EIS fails to provide an adequate discussion of appropriate mitigation measures for wildlife impacts within the Proposed Action area.

176.     The EIS fails to provide an adequate discussion of appropriate mitigation measures for toxic chemical impacts within the Proposed Action area.

COMPLAINT - 32

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

177.     The EIS fails to provide an adequate discussion of appropriate mitigation measures for climate change and air quality impacts within the Proposed Action area.

178.     Defendants' actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE**
**NATIONAL HISTORIC PRESERVATION ACT**

179.     Plaintiffs restate and incorporate by reference all preceding paragraphs.

180.     The Navy's decision under Section 106 of the National Historic Preservation Act violated the NHPA because the Navy failed to avoid or mitigate adverse effects on Ebey's Landing National Historic Reserve and refused to adopt the recommendations from the Advisory Council on Historic Preservation without providing an adequate rationale.

181.     The Navy's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

**VIII.   PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court grant the following relief:

A.     Order, declare, and adjudge that the defendants have violated the National Environmental Policy Act, and the National Historic Preservation Act and their implementing regulations as set forth above;

B.     Issue a preliminary and final order enjoining the defendants from implementing the Proposed Action;

COMPLAINT - 33

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

C.      Order the defendants to prepare a supplemental draft EIS and supplemental final EIS that corrects the deficiencies identified by the Court;

D.      Order the defendants to withdraw the Record of Decision approving the Proposed Action;

E.      Award the plaintiffs their costs, litigation expenses, expert witness fees, and reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act and all other applicable authorities; and

F.      Grant plaintiffs any such further relief as may be just, proper, and equitable.

Dated this 9th day of July, 2019.

Respectfully submitted by counsel for Plaintiffs Citizens of the Ebey's Reserve for a Healthy, Safe and Peaceful Environment and Paula Spina,

BRICKLIN & NEWMAN, LLP

By:      /s/ David A. Bricklin
         /s/ Claudia M. Newman
         /s/ Zachary K. Griefen
         David A. Bricklin, WSBA No. 7583
         Claudia M.  Newman, WSBA No.  24928
         Zachary K.  Griefen, WSBA No.  48608
         1424 Fourth Avenue, Suite 500
         Seattle, WA  98101
         Telephone:  206-264-8600
         Facsimile:  206-264-9300
         E-mail: bricklin@bnd-law.com
         E-mail: newman@bnd-law.com
         E-mail: griefen@bnd-law.com

COMPLAINT - 34

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300